Filed 8/23/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| IRMA RAMIREZ, Individually and as Representative, etc., | B279873 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC609508) |
| v. | |
| CITY OF GARDENA, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Yvette M. Palazuelos, Judge.  Affirmed.

Innabi Law Group, Abdalla J. Innabi and Amer Innabi for Plaintiffs and Appellants.

Manning & Kass, Ellrod, Ramirez, Trester, Mildred K. O'Linn, Tony M. Sain and Ladell H. Muhlestein for Defendant and Respondent.

_____

Mark Gamar was a passenger in a pickup truck that was the subject of a pursuit by police officers employed by the City of Gardena (the City) on February 15, 2015. Gamar died from injuries he sustained when the truck spun into a street light pole after one of the officers bumped the left rear of the truck with the right front of his vehicle to stop the truck using a maneuver called a "Pursuit Intervention Technique" (PIT). Plaintiff and appellant Irma Ramirez, Gamar's mother, filed a wrongful death suit against the City, claiming that the officer acted negligently and committed battery in conducting the PIT maneuver.

The trial court granted summary judgment in favor of the City, finding that the City was immune from liability for the officer's conduct under Vehicle Code section 17004.7.[1] That statute provides immunity to a "public agency employing peace officers" when the agency adopts and promulgates a policy on vehicular pursuits in compliance with the requirements of the statute. Ramirez argues that (1) the City's vehicular pursuit policy did not comply with section 17004.7 because it did not adequately specify the criteria for employing pursuit intervention tactics, and (2) the City did not adequately promulgate its policy. We reject both arguments and affirm.

### BACKGROUND

#### 1.    *The Vehicle Pursuit*

We only briefly summarize the circumstances surrounding the incident that led to Gamar's death, as they are not relevant to the issues on this appeal.

---

[1] Subsequent undesignated statutory references are to the Vehicle Code.

Shortly after 11:00 p.m. on the night of February 15, 2015, several officers employed by the City heard reports of an armed robbery that had occurred about 10 minutes previously. The suspects had reportedly fled in a blue 1980's Toyota pickup truck.

Officer Michael Nguyen subsequently saw a 1980's Toyota pickup truck and observed that the two occupants matched the descriptions of the robbery suspects. Nguyen attempted to stop the vehicle by activating his emergency lights and siren, but the vehicle fled, failing to stop at traffic signals and veering into oncoming traffic. Nguyen pursued, followed by several other patrol vehicles.

The truck made several turns before approaching the Harbor Freeway. At times the truck was traveling about 60 miles per hour in a 35 mile per hour residential zone.

The pursuing officers testified that they believed the truck was about to enter the freeway going in the wrong direction. Nguyen performed a PIT maneuver by ramming his patrol vehicle into the left rear portion of the pickup truck's bed. The truck lost control, spun, and collided into a light pole. The driver climbed out of the driver's door and was detained. The officers saw that the passenger (Gamar) had a shotgun next to him. The officers removed the shotgun and pulled Gamar from the truck. They laid him on the sidewalk, where he received medical assistance.

The pursuit lasted between one and two minutes before the crash occurred.

### 2. *The City's Pursuit Policy*

At the time of the incident, the City had a written policy on vehicle pursuits that was contained in a portion of the police manual.[2] The policy contained sections on initiating and discontinuing a vehicle pursuit (discussed in more detail below).

The policy also contained a section addressing vehicular pursuit driving tactics. That section stated that the PIT maneuver "can be used to stop a pursuit, as soon as possible, with Watch Commander approval, if practical." Another portion of that section instructed officers that "[a]ll forcible stop tactics (e.g., roadblocks, ramming, boxing-in, or channelization) shall only be used as a last resort in order to stop a fleeing violator in keeping with Departmental guidelines regarding use of force and pursuit policy."

The City provided training to its police officers on its pursuit policy on at least an annual basis. As part of that training, officers were required to certify electronically that they had received, read, and understood the pursuit policy.

A training log produced by the City confirmed that 81 of the City's 92 officers (including Officer Nguyen) had completed the annual training on the City's pursuit policy within a year of the incident. The City also produced written certifications completed by 64 officers in 2009 and 2010 attesting that they had received, read, and understood the City's pursuit policy.[3] According to

---

[2] The City apparently adopted a new pursuit policy several weeks after the incident occurred, which Ramirez acknowledges was coincidental.

[3] The certifications were in a form recommended by the Commission on Peace Officer Standards and Training (POST), which also prepared vehicle pursuit guidelines on which the

4

testimony submitted by the City's custodian of records, Lieutenant Mike Saffell (discussed further below), all City officers employed at the time of the incident completed such forms, but some forms might have been lost during the police department's move to a new station.

### 3. *The City's Summary Judgment Motion*

The City moved for summary judgment on the grounds that (1) the officers' conduct in conducting the pursuit was reasonable as a matter of law, and the City therefore could not be derivatively liable, and (2) the City was immune under section 17004.7. The trial court granted the motion.

With respect to the first ground for the City's motion, the trial court found disputed issues of fact concerning the reasonableness of Officer Nguyen's actions in conducting the PIT maneuver. Among other things, the court concluded that there were disputes concerning (1) whether a reasonable police officer would have believed that lives were in danger before deciding to initiate the PIT maneuver, (2) whether a reasonable officer would have concluded that the truck was about to enter the freeway going the wrong way, and (3) whether the truck applied its brakes or slowed down.

However, with respect to the second ground of the motion, the trial court found that the City was immune under section 17004.7. The court concluded that the "City properly promulgated its pursuit policy in compliance with Vehicle Code § 17004.7(b) and provided regular and periodic training." Based on the Saffell declaration, the court found that "[a]ll active duty

---

requirements of section 17004.7, subdivision (c) are modeled. (§ 17004.7, subd. (e).)

5

police officers received the training on an annual basis or more frequently and were required to certify that he or she read, received, and understood the pursuit policy and training."

The trial court also found that the City's pursuit policy met the requirements of section 17004.7. The court concluded that, in compliance with section 17004.7, subdivision (c), the City's policy provided "objective standards by which to evaluate the pursuit and whether it should be initiated and what tactics to employ."

## DISCUSSION

### 1. *Standard of Review*

We apply a de novo standard of review to the trial court's summary judgment ruling. We interpret the evidence in the light most favorable to Ramirez as the nonmoving party and resolve all doubts about the propriety of granting the motion in her favor. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206 (*Lonicki*).) We consider all the evidence before the trial court except that to which objections were made and properly sustained. (*Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1451–1452.) Although we independently review the City's motion, Ramirez has the responsibility as the appellant to demonstrate that the trial court's ruling was erroneous. (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 372.)

In exercising our independent review, we apply the standards applicable to summary judgment motions. A defendant may obtain summary judgment by establishing a complete defense to the plaintiff's claim. (Code Civ. Proc., § 437c, subd. (p)(2).) Governmental immunity under Vehicle Code section 17004.7 is an affirmative defense. (*City of Emeryville v. Superior Court* (1991) 2 Cal.App.4th 21, 23.) The defendant has the initial burden to show that such a defense applies. (Code Civ.

6

Proc., § 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850–851.)  Once the moving party does so, the burden of production shifts to the opposing party to show the existence of disputed material facts.  (Code Civ. Proc., § 437c, subd. (p)(2); Aguilar, at pp. 850–851.)  The parties must meet their respective burdens by providing admissible evidence.  (Code Civ. Proc., § 437c, subd. (d); *Jambazian v. Borden* (1994) 25 Cal.App.4th 836, 846.)

Section 17004.7, subdivision (f) provides that "[a] determination of whether a public agency has complied with subdivisions (c) and (d) is a question of law for the court."  We independently review such questions of law.  (*Colvin v. City of Gardena* (1992) 11 Cal.App.4th 1270, 1281 (*Colvin*).)[4]

### 2.     *The City's Pursuit Policy Met the Requirements of Section 17004.7*

Vehicle Code section 17004.7 is part of a broader statutory scheme determining when public entities may be liable under California law.  Under Government Code section 815, subdivision

---

[4] Vehicle Code section 17004.7, subdivision (c) describes the minimum standards for pursuit policies, and subdivision (d) defines training requirements.  The statute's promulgation requirements are identified in a different subdivision, (b)(2).  Thus, the plain language of section 17004.7 does not rule out the possibility that the adequacy of a public agency's promulgation efforts might depend upon factual findings.  However, because this is an appeal from a summary judgment ruling, we need not consider the appropriate procedure for deciding any such factual issues under section 17004.7.  The trial court's order granting summary judgment presents an issue of law.  As with other issues of law, we review it independently.  (Code Civ. Proc., § 437c, subd. (c); *Lonicki, supra,* 43 Cal.4th at p. 206.)

(a), "[e]xcept as otherwise provided by statute:  [¶] (a) [a] public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."  This reflects the principle that, in California, "sovereign immunity is the rule" and "governmental liability is limited to exceptions specifically set forth by statute."  (*Cochran v. Herzog Engraving Co.* (1984) 155 Cal.App.3d 405, 409.)

Section 17001 creates such an exception.  It provides that "[a] public entity is liable for death or injury to person or property proximately caused by a negligent or wrongful act or omission in the operation of any motor vehicle by an employee of the public entity acting within the scope of his employment."

Section 17004.7 in turn limits the liability that section 17001 otherwise permits by affording immunity to public agencies that adopt and implement appropriate vehicle pursuit policies.  Section 17004.7, subdivision (b)(1) provides that "[a] public agency employing peace officers that adopts and promulgates a written policy on, and provides regular and periodic training on an annual basis for, vehicular pursuits complying with subdivisions (c) and (d) is immune from liability for civil damages for personal injury to or death of any person or damage to property resulting from the collision of a vehicle being operated by an actual or suspected violator of the law who is being, has been, or believes he or she is being or has been, pursued in a motor vehicle by a peace officer employed by the public entity."  Subdivision (c) sets forth 12 specific issues that a pursuit policy must address, and subdivision (d) addresses training requirements.  (§ 17004.7, subds. (c) & (d).)

Subdivision (b)(2) identifies the requirements for promulgating a public agency's pursuit policy.  The subdivision

8

states that promulgation "shall include, but is not limited to, a requirement that all peace officers of the public agency certify in writing that they have received, read, and understand the policy. The failure of an individual officer to sign a certification shall not be used to impose liability on an individual officer or a public entity." (§ 17004.7, subd. (b)(2).)

Citing *Morgan v. Beaumont Police Dept.* (2016) 246 Cal.App.4th 144 (*Morgan*), Ramirez argues that, under section 17004.7, subdivision (b)(2), the City could only meet its burden to show adequate promulgation of its pursuit policy by proving that *each* of its officers signed a certification attesting that he or she had received, read, and understood the policy. Ramirez claims that the City did not meet this requirement because it provided insufficient evidence of a written certification by each City police officer. Ramirez also claims that the City's pursuit policy failed to specify adequate criteria under subdivision (c) with respect to two issues: "driving tactics" and "authorized pursuit intervention tactics." (§ 17004.7, subd. (c)(5)–(6).)[5] We address each argument below.

### a. *Evidence of promulgation*

The City claims that it provided evidence of 100 percent compliance with the written certification requirement through the Saffell declaration. Saffell testified that, "[u]pon review of my Department's records, I am informed and believe that all of the officers who were employed at the time of the incident" completed

---

[5] On appeal, the City does not challenge the trial court's finding that disputed issues of fact exist with respect to whether the actions of Officer Nguyen in initiating and executing the PIT maneuver were reasonable. We therefore need consider only the issue of immunity under section 17004.7.

written certifications stating that they had received, reviewed and understood the City's "pursuit/safety policies." Ramirez disputes whether this declaration is sufficient to establish that each of the City's officers executed a written certification.

We need not reach that dispute. Given the importance of the statutory interpretation question that the parties have briefed, we consider that issue first. Our disposition of that issue makes it unnecessary to consider the adequacy of the Saffell declaration. As discussed below, we conclude that section 17004.7, subdivision (b)(2) does not require proof of compliance by every officer with the written certification requirement as a prerequisite to immunity. Thus, other evidence that the City submitted—in the form of the POST certifications and the electronic training log—is sufficient to support summary judgment under section 17004.7, subdivision (b)(2), even though that evidence does not establish 100 percent compliance with the written certification requirement.[6]

---

[6] We reject Ramirez's argument that the training log was inadmissible hearsay. Although she objected to the log, Ramirez also introduced the log in support of her own opposition to the City's summary judgment motion before the trial court had ruled on her objection. In doing so, she waived any objection to its admissibility. (*People v. Williams* (1988) 44 Cal.3d 883, 912 ["It is axiomatic that a party who himself offers inadmissible evidence is estopped to assert error in regard thereto"].) We also reject Ramirez's broader argument that a public entity claiming immunity under section 17004.7 can prove the fact of written certifications only by introducing the certifications themselves. Section 17004.7 contains no such specific evidentiary rule. Section 17004.7, subdivision (b)(2) includes a "requirement that all peace officers of the public agency certify in writing" their receipt and understanding of the public agency's pursuit policy,

10

### b. *The City adequately promulgated its pursuit policy under section 17004.7, subdivision (b)(2)*

Section 17004.7, subdivision (b)(2) states that a public agency's promulgation of a pursuit policy "shall include, but is not limited to, *a requirement* that *all* peace officers of the public agency certify in writing that they have received, read, and understood the policy." (Italics added.) Relying on *Morgan, supra,* 246 Cal.App.4th 144, Ramirez argues that the City is not entitled to immunity because it failed to provide evidence that *all* of its officers executed written certifications in compliance with section 17004.7, subdivision (b)(2). We respectfully disagree with the interpretation of the statutory promulgation requirement that the court adopted in *Morgan*.

In *Morgan,* the Fourth District Court of Appeal considered a promulgation procedure in which the Beaumont Police Department (the Department) provided notifications of policy updates to officers by e-mail. The e-mails directed the officers to access the policy at one of several electronic locations and the officers were then required to acknowledge receipt of the policy by a reply e-mail. (*Morgan, supra,* 246 Cal.App.4th at p. 161.) The court found that this procedure failed to satisfy section 17004.7 for two independent reasons. First, the officers' e-mails only acknowledged receipt of the policy and did not acknowledge that they had "received, read, and under[stood]" the policy as subdivision (b) of section 17004.7 requires. Second, and as is

---

but it does not contain any limitation on how such certification may be proved. We therefore apply the evidentiary rules that ordinarily control proof of facts in summary judgment proceedings.

11

germane here, the Department's e-mail records did not show that each officer even acknowledged receipt. The officers' acknowledgment e-mails were not retained, and the declaration that the Department offered in support of its motion stated only that the " 'vast majority' " of officers comply with the e-mail acknowledgement process. (*Id*. at p. 162.)

The court in *Morgan* concluded that section 17004.7, subdivision (b)(2) is unambiguous in requiring proof that *each* officer provided a written certification as a condition of immunity. (*Morgan, supra,* 246 Cal.App.4th at p. 154.) The court also found support for this interpretation in the legislative history of the section.

The Legislature amended section 17004.7 in 2005 (Stats. 2005, ch. 485, § 11) after another decision by the Fourth District Court of Appeal, *Nguyen v. City of Westminster* (2002) 103 Cal.App.4th 1161 (*Nguyen*). Because the City of Westminster had adopted a pursuit policy, the court in *Nguyen* found that it was immune from liability for an accident in a school parking lot following a police pursuit. The city's policy was " 'poorly organized,' " raising questions about whether it was actually implemented. (*Morgan, supra,* 246 Cal.App.4th at p. 155, quoting *Nguyen*, at p. 1166.) However, the version of section 17004.7 in effect at the time *Nguyen* was decided required only that a public agency *adopt* a compliant policy, and did not require the agency actually to implement the policy to obtain immunity. (*Morgan,* at pp. 155–156.) The court in *Nguyen* "reluctantly" affirmed summary judgment in favor of the city while inviting the Legislature to change section 17004.7. (*Nguyen,* at pp. 1163, 1168–1169.)

In response to that invitation, the Legislature amended section 17004.7 to add an implementation requirement in the form of the current training and promulgation provisions. (*Morgan, supra,* 246 Cal.App.4th at pp. 158–159.) The court in *Morgan* concluded that this legislative history "highlights the important public policy underlying the promulgation requirement in current section 17004.7." (*Id.* at p. 159.)

Like the court in *Morgan*, we analyze section 17004.7 using "settled principles of statutory interpretation." (*Morgan, supra,* 246 Cal.App.4th at p. 151.) Our task is to " ' " ' "ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." ' " ' " (*Ibid.*, quoting *Apple Inc. v. Superior Court* (2013) 56 Cal.4th 128, 135.) In doing so, we "begin by examining the statutory language, giving the words their usual and ordinary meaning." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 (*Day*).) We construe the statutory language in context and attempt to harmonize provisions relating to the same subject matter if possible. (*Morgan,* 246 Cal.App.4th at p. 151, citing *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) If the language is not ambiguous, "we presume the lawmakers meant what they said, and the plain meaning of the language governs." (*Day, supra*, 25 Cal.4th at p. 272.) However, if there is ambiguity, we may "resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*Ibid.*) We then " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." ' " (*Ibid.,* quoting *People v. Coronado* (1995) 12 Cal.4th 145, 151.)

We disagree with the *Morgan* court's conclusion that section 17004.7, subdivision (b)(2) is unambiguous. In finding it so, the court in *Morgan* did not consider any other possible constructions of the provision. In particular, the court did not consider the alternative construction that the City suggests here.

The City argues that the definition of "promulgation" in section 17004.7, subdivision (b)(2) means that the public agency must implement *its own* requirement that all of its peace officers certify their receipt and understanding of the agency's pursuit policy. While the agency must *require* all officers to sign a written acknowledgment, the agency need not prove that 100 percent of its officers have actually complied with that requirement to obtain immunity.

This construction is not only plausible, but is more consistent with the language of the subdivision. As mentioned, the final sentence of section 17004.7, subdivision (b)(2) states that "[t]he failure of an individual officer to sign a certification shall not be used to impose liability on an individual officer or a public entity." This language on its face supports the City's proposed interpretation, which we find persuasive.

The court in *Morgan* found no inconsistency between this sentence and the court's conclusion that "promulgation" requires 100 percent compliance because it distinguished between the concepts of " 'impos[ing] liability' " and precluding immunity. (See *Morgan, supra,* 246 Cal.App.4th at p. 160.) The court did not identify any basis for this distinction in the language of the statute or in the legislative history, and we find none.

The failure of an individual officer to execute a written certification does in fact operate to "impose liability" on a public agency when it makes immunity unavailable for a claim on which

14

the agency would otherwise be liable. Thus, the *Morgan* court's interpretation fails to give effect to the plain language of the sentence.

The court's distinction between imposing liability and removing immunity is even more strained when considering claims against an individual officer (which the final sentence of section 17004.7, subdivision (b)(2) also addresses). We must interpret section 17004.7, subdivision (b)(2) in the context of the statutory scheme of which it is a part. (*Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1090–1091 ["It is a basic canon of statutory construction that statutes in pari materia should be construed together so that all parts of the statutory scheme are given effect"].) Section 17004 provides broad immunity to public employees who cause the injury or death of another while pursuing a suspect in an emergency vehicle in the line of duty. Thus, there is no obvious way in which a police officer's failure to certify his or her understanding of a pursuit policy could be used to "impose" individual liability other than by somehow revoking the broad immunity that section 17004 would otherwise provide.

Moreover, if the Legislature had intended to make public agency immunity in section 17004.7 dependent upon 100 percent compliance with the written certification requirement, it could have said so much more directly. Rather than stating that promulgation "shall include . . . a requirement," it could simply have said that promulgation "means" written certification by all officers. (See § 17004.7, subd. (b)(2).) The Legislature used precisely that construction in section 17004.7, subdivision (d) in defining the training requirement, where it stated that " '[r]egular and periodic training' under this section *means* annual training" that includes specified elements. (Italics

15

added.)  Thus, the City's proposed interpretation of the promulgation requirement makes sense when harmonized with other sections of the statute.

We must also interpret section 17004.7 in light of the purposes of the statute, with attention to whether a particular interpretation would " ' "lead to absurd consequences." ' " (*Day, supra,* 25 Cal.4th at p. 272.)  The City's interpretation would fulfill the Legislature's goal of motivating a public agency to implement its pursuit policy—including by *requiring* its officers to certify their receipt and understanding of that policy in writing—even if a few officers fail to fulfill that requirement.  On the other hand, requiring 100 percent compliance as a condition of immunity could potentially result in the absurd circumstance that the failure of a single officer to complete a written certification in an agency employing thousands could undermine the agency's ability to claim immunity, even though the agency conscientiously implemented its pursuit policy.

The City's proposed interpretation is also consistent with the legislative history of section 17004.7.  As the court observed in *Morgan,* and as Ramirez argues here, the history of the 2007 amendment to section 17004.7 certainly shows that the Legislature viewed the promulgation requirement as an important provision to ensure that public agencies actually implement the policies that they nominally adopt.  However, the fact that promulgation is *important* does not shed light on precisely what it must involve.  Consider a public agency that diligently and effectively promulgates its pursuit policy through dissemination of the written policy, regular training, and a requirement for written certification by its officers, including consequences for those who fail to certify.  Such conscientious

16

conduct seemingly recognizes the importance of implementing the pursuit policy that the agency has adopted. Nevertheless, under Ramirez's interpretation, such an agency would not be entitled to immunity if a particular officer fails to meet the requirements of his or her job by neglecting or refusing to complete a written certification. We should not assume that the Legislature intended such extreme and arbitrary consequences simply from the fact that it regarded the promulgation requirement as an important addition to section 17004.7.[7]

The legislative history also shows that the Legislature did not intend to abandon the concept of a "balance between public entity immunity and public safety" in amending section 17004.7. (See *Nguyen, supra,* 103 Cal.App.4th at p. 1169.) Section 17004.7 has historically served two purposes: It was intended to "free

---

[7] The court in *Morgan* also found support for its interpretation in POST Commission guidelines stating that peace officers must " 'sign an attestation form (doc) that states they have "received, read, and understand" the agency pursuit policy.' " (See *Morgan, supra,* 246 Cal.App.4th at p. 159.) But the issue here is not whether a written certification requirement exists, but rather what the consequences are if an officer fails to meet that requirement. The City does not dispute that public agencies must implement a written certification requirement; it simply claims that Vehicle Code section 17004.7 does not *itself* require written certification by all officers as a condition of immunity. Moreover, section 17004.7 refers to the POST Commission guidelines only with respect to the training requirements specified in subdivision (d), not with respect to the promulgation provision contained in subdivision (b). (See Veh. Code, § 17004.7, subd. (d) [requiring compliance with the training guidelines established by the POST Commission pursuant to Penal Code section 13519.8].)

17

police officers from the fear of exposing their employers to liability when engaging in high-speed pursuits," and also to "reduce the frequency of accidents involving the public by encouraging public agencies to adopt safe pursuit policies." (*Billester v. City of Corona* (1994) 26 Cal.App.4th 1107, 1122.) Before adopting the 2007 amendment to section 17004.7, the Legislature rejected various bills that would have restricted immunity by making it dependent on individual circumstances, such as (1) whether the particular officers involved in an incident actually complied with their agency's pursuit policy, (2) whether they acted in "bad faith", or (3) whether they had a reasonable suspicion that the fleeing suspect had committed a violent felony. The Legislature rejected those changes in response to concerns by law enforcement agencies that the changes were too extreme and would lead to "protracted litigation regarding every pursuit that results in injury to a third party." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 719 (2005–2006 Reg. Sess.) as amended May 5, 2005, pp. 2, 7–8.) Thus, in amending section 17004.7 the Legislature was careful not to move too far in the direction of protecting public safety at the expense of a predictable and certain immunity provision.

The interpretation of the promulgation provision that the court adopted in *Morgan* (and that Ramirez urges here) sacrifices such predictability and certainty. Under that interpretation, an agency could do all within its power to implement its pursuit policy but still be liable if a single negligent or recalcitrant officer happens to be out of compliance with the agency's certification requirement at the time an incident occurs. Conditioning an agency's entitlement to immunity on the behavior of particular officers is inconsistent with the approach that the Legislature

18

adopted in amending section 17004.7 to ensure that *agencies* took appropriate steps to implement their pursuit policies.[8]

We therefore agree with the City that "promulgation" in section 17004.7, subdivision (b)(2) means that, to obtain immunity, a public agency must *require* its peace officers to certify in writing "that they have received, read, and understand" the agency's pursuit policy. However, if the agency actually imposes such a requirement, complete compliance with the requirement is not a prerequisite for immunity to apply.

There is no dispute here that the City actually had a requirement that its officers execute the requisite written certification. Saffell testified that the City provides training on its pursuit policies on an annual basis to all of its active duty police officers, and that, "[i]n providing such training materials to [City police] officers, each officer is required to certify electronically (in some form) that he or she has read, received, and understood our policies." In opposing summary judgment, Ramirez did not controvert the existence of the City's certification requirement, but claimed only that the City "failed to 'promulgate' its pursuit policy to *all* of its peace officers where *each and every officer certified in writing that they have received, read, and understood the policy*." We therefore reject Ramirez's claim that the City did not adequately promulgate its pursuit policy under section 17004.7, subdivision (b)(2).

---

[8] As discussed above, this same concern that a public agency's liability not depend upon the behavior of a particular officer is also reflected in the final sentence of section 17004.7, subdivision (b)(2), stating that the "failure of an individual officer to sign a certification" shall not be used to impose liability.

19

### c. The City's pursuit policy met the criteria of section 17004.7, subdivision (c).

Section 17004.7, subdivision (c) requires public agencies to address 12 specific standards in the pursuit policies that they adopt. The standards provide guidance to officers on various aspects of the decisions that they must make in considering whether to initiate or continue a pursuit, and how the pursuit should be conducted.[9] Section 17004.7 requires public agencies to address these standards in their policies, but leaves to the agencies to determine the substance of the instruction to provide to their officers on each standard. The judicial obligation "to interpret police policies for purposes of . . . section 17004.7 does not give us the supervisory power to dictate good (or bad) law enforcement tactics." (*McGee v. City of Laguna Beach* (1997) 56 Cal.App.4th 537, 548 (*McGee*); see also *Ketchum v. State of*

---

[9] The 12 standards direct public agencies to provide guidance to officers in determining: (1) under what circumstances to initiate a pursuit; (2) the total number of law enforcement vehicles authorized to participate in a pursuit, and their responsibilities; (3) the communication procedures to be followed during a pursuit; (4) the role of the supervisor in managing and controlling a pursuit; (5) driving tactics and the circumstances under which the tactics may be appropriate; (6) authorized pursuit intervention tactics, including "blocking, ramming, boxing, and roadblock procedures"; (7) the factors to be considered by a peace officer and supervisor in determining speeds throughout a pursuit; (8) the role of air support, where available; (9) when to terminate or discontinue a pursuit; (10) procedures for apprehending an offender following a pursuit; (11) effective coordination, management, and control of interjurisdictional pursuits; and (12) reporting and postpursuit analysis "as required by Section 14602.1." (§ 17004.7, subd. (c).)

*California* (1998) 62 Cal.App.4th 957, 969 (*Ketchum*) ["We decline to abandon our role as judges and legislate police policy by dictating the elements of the pursuit policy"].)

Ramirez challenges the adequacy of the City's policy under subdivision (c)(5) and (6) of section 17004.7 (i.e., driving tactics and pursuit intervention tactics). Ramirez argues that the City's pursuit policy was deficient because it did not provide guidance on the circumstances in which pursuit intervention tactics may be used, but rather left "*full discretion*" to individual officers to use such tactics "as they saw fit." Ramirez cites cases holding that a policy is inadequate when it simply advises officers to exercise their discretion. (See *Colvin, supra,* 11 Cal.App.4th 1270; *Payne v. City of Perris* (1993) 12 Cal.App.4th 1738 (*Payne*).)

The cases on which Ramirez relies involved policies that failed to provide any objective standards to guide officers' discretion. For example, in *Colvin* (which involved a claim brought against the City based upon a prior pursuit policy), the policy at issue simply stated that an officer could initiate a pursuit when the officer " 'has reasonable cause to stop a vehicle and the driver fails to stop as required by law,' " and that the officer should " 'consider' " discontinuing a pursuit " 'when it poses a serious and unreasonable risk of harm to the pursuing officer or to the public balanced against the seriousness of the violations, or when directed to do so by a supervisor.' " (*Colvin, supra,* 11 Cal.App.4th at p. 1283.) The court concluded that, in drafting its policy, the City apparently made a calculated decision to "clothe its officers with maximum discretion and flexibility." (*Id.* at p. 1285.) The court found that the policy did not meet the standards of section 17004.7 as it lacked "specific pursuit guidelines." (*Ibid.*)

Similarly, in *Payne,* the policy provision at issue merely instructed that " '[o]fficers should consider discontinuing a pursuit when it poses a serious and unreasonable risk of harm to the pursuing officer or to the public, balanced against the seriousness of the violation(s).  [¶]  Justification to continue a pursuit will be based on what reasonably appears to be the facts known or perceived by the officer.' " (*Payne, supra,* 12 Cal.App.4th at p. 1746.)  The court concluded that this language simply memorialized officers' "unfettered discretion" without any objective standards to "control and channel" that discretion.  (*Id.* at p. 1747.)

In contrast to those cases, courts have found public agencies' policies sufficient under section 17004.7 when they provide guidance to officers concerning factors to consider, even if they also leave room for the exercise of individual discretion in particular cases.  For example, in *McGee,* the court distinguished the City of Laguna Beach's (Laguna Beach) policy at issue in that case from the policies in *Colvin* and *Payne*, finding that the Laguna Beach policy "lists factors pursuing officers should consider in evaluating whether to begin or abandon a pursuit." (*McGee, supra,* 56 Cal.App.4th at pp. 543–544.)  Those factors included "seriousness of the offense, time of day, traffic and weather conditions, speed, danger to officers and others, and other methods of arrest."  (*Id.* at p. 544.)

The court concluded that the objective factors identified in the Laguna Beach policy were sufficient under section 17004.7 even though the policy contained a provision stating that " 'nothing in this policy shall be construed to impose a ministerial duty on any officer of the department, and all related conduct shall be considered discretionary.' " (*McGee, supra,* 56

Cal.App.4th at p. 544.) The discretion that the policy provided was guided by the objective factors identified in the policy and did not leave "unfettered" discretion to the officers. (*Ibid.*; see also *Ketchum, supra,* 62 Cal.App.4th at p. 970 [distinguishing *Payne* on the ground that the California Highway Patrol pursuit policy at issue in *Ketchum* "sets forth certain circumstances under which an officer should usually abort the pursuit"]; *Alcala v. City of Corcoran* (2007) 147 Cal.App.4th 666, 676 (*Alcala*) [finding a pursuit policy sufficient where it "does not stop with generalized statements instructing officers to use good judgment and weigh the risks involved," but also identified specific criteria].)

As in *McGee, Ketchum* and *Alcala*, the City's policy here contained specific guidance concerning the circumstances in which a pursuit is appropriate and the factors to consider in deciding whether to continue or terminate the pursuit. The policy directed that a pursuit should be initiated "only when a law violator clearly exhibits the intention to avoid arrest by using a vehicle to flee, or when a suspected law violator refuses to stop and uses a vehicle to flee." In deciding whether to pursue, officers were to consider: "1. The type of violation, whether actual or suspected [¶] 2. Accurate vehicle description and plate number [¶] 3. Pursuit speeds, pedestrian and traffic conditions."

The officers involved in a pursuit were also directed to "continually question whether the seriousness of the violation reasonably warrants continuation of the pursuit," and were responsible for discontinuing the pursuit when "there is a clear and unreasonable danger to the public or to the pursuing officers." The policy provided "possible indicators" of a clear and unreasonable danger, including: "1. When speed dangerously

23

exceeds the normal flow of traffic [¶] 2.  When pedestrian or vehicular traffic necessitates unreasonable and unsafe maneuvering of the vehicle [¶] 3.  Duration and location of pursuit [¶] 4.  Volume of vehicular traffic [¶] 5.  Volume of pedestrian traffic [¶] 6.  Time of day [¶] 7.  Weather conditions [¶] 8.  Road conditions [¶] 9.  Familiarity of the pursuing officer with the area of the pursuit [¶] 10.  Quality of radio communications between pursuing units and the dispatchers [¶] 11.  Capability of the police vehicles involved [¶] 12.  Whether the suspect(s) is identified and can be apprehended at a later point in time [¶] 13.  The overall risk posed to the public by the escape of the suspect(s), and the likelihood that the suspect(s) [*sic*] actions will continue if that person is not apprehended."

The policy contained a separate section (section I) on pursuit driving tactics, addressing issues such as "paralleling of the pursuit route," the units that are to drive "Code-3" (i.e., with lights and siren), caravanning, and restrictions on passing. Section I also addressed "forcible stop tactics," including the PIT maneuver that Officer Nguyen used in this case.  The policy instructed that all forcible stop tactics "shall only be used as a last resort in order to stop a fleeing violator in keeping with Department guidelines regarding use of force and pursuit policy." With respect to the PIT maneuver specifically, the policy stated that the maneuver "can be used to stop a pursuit, as soon as possible, with Watch Commander approval, if practical."

While the specific instructions on forcible stop tactics were brief and general, they must be read in light of the policy as a whole.[10]  (See *McGee, supra,* 56 Cal.App.4th at p. 547 ["We reach

---

[10] Ramirez argues that the policy in effect at the time of the incident at issue in this case was inadequate in comparison to the

24

our decision based upon the *totality* of the 20-page Laguna policy, including its communications component, *and* its repeated emphasis on pubic and officer safety in balancing the risks of a pursuit against the need to immediately capture an offender"].) Section I.6 of the City's policy in fact directed consideration of other portions of the pursuit policy in making a decision about forcible stop tactics by stating that those tactics should be used "in keeping with Departmental . . . pursuit policy."[11]

The other policy provisions discussed above provided specific criteria for the City's officers to consider in balancing the need for particular pursuit tactics against the danger to the public and to the officers. In particular, the section concerning

---

more detailed policy that the City adopted shortly after that incident had occurred. But that is not a relevant comparison. Our task is not to decide whether some other policy might have been better than the policy the City used at the time of the incident, but only whether the policy at issue adequately addressed the specific standards identified in section 17004.7, subdivision (c). (*McGee, supra,* 56 Cal.App.4th at p. 548.)

[11] Ramirez argues that the City's designated person most knowledgeable on the topic of its pursuit policies, Detective Michael Ross, admitted at his deposition that the City's policy failed to provide any instruction as to the specific conditions and circumstances in which a PIT maneuver should be used. While Ross initially testified that he could not identify any such instruction in the policy, he later corrected his testimony to state that "[t]here's no separate factors, but a PIT is governed by the same policy factors as a use of force & pursuit." We are tasked with reviewing the adequacy of the policy itself as a matter of law. (§ 17004.7, subd. (f).) The language of the written policy supports Ross's corrected testimony that other policy factors also apply to the decision to use a PIT maneuver.

25

initiation of a pursuit stated specifically that officers should consider "[p]ursuit speeds, pedestrians and traffic conditions" along with the type of violation and the accurate identification of the vehicle "[w]hen deciding the merits of initiating *any* pursuit-related activities."[12]  (Italics added.)

These policy provisions did not provide unfettered discretion to pursuing officers, as Ramirez claims.  Rather, they "appropriately 'control[led] and channel[ed]' the pursuing officer's discretion" in deciding whether to use forcible tactics to stop a pursuit and apprehend a suspect.  (*McGee, supra,* 56 Cal.App.4th at p. 546.)  We therefore conclude that the City's pursuit policy in place at the time of the incident met the standards of section 17004.7, subdivision (c).

---

[12] Presumably accurate identification of the pursued vehicle, including a correct plate number, would increase the likelihood that a suspect could be apprehended later if the pursuit were discontinued.

## DISPOSITION

The judgment is affirmed.  The City of Gardena is entitled to its costs on appeal.

LUI, J.

We concur:

ROTHSCHILD, P. J.

JOHNSON, J.